[Cite as *State v. Hunt*, 2013-Ohio-5326.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 12AP-1037 |
| v. | : | (C.P.C. No. 12CR-05-2633) |
| Andrew E. Hunt, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 5, 2013

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

*Dennis C. Belli*, for appellant.

APPEAL from the Franklin County Court of Common Pleas.

SADLER, J.

{¶ 1} Defendant-appellant, Andrew E. Hunt, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of murder, with specifications, and having a weapon while under disability. For the following reasons, we affirm the judgment of the trial court.

I. BACKGROUND

{¶ 2} On May 24, 2012, appellant was indicted for one count of murder in violation of R.C. 2903.02 and one count of having a weapon while under disability ("WUD") in violation of R.C. 2923.13. The murder count included specifications for use of a firearm and discharging a firearm from a motor vehicle, as well as a specification alleging appellant was a repeat violent offender ("RVO") based on a 1997 felonious assault conviction. The indicted charges arose out of the May 16, 2012 shooting death of

James Daniel Canty. Appellant waived his right to a jury trial on the WUD charge, and the matter proceeded to trial where the following evidence was adduced.

{¶ 3} Columbus Police Officer Brian Smith responded to Vida Place shortly before 4:00 a.m., on May 16, 2012, on the report of a shooting. When Officer Smith arrived, he saw Canty laying on the ground and a gentleman holding a towel on Canty's neck in an effort to stop the bleeding. A witness told Officer Smith the shooter was in a "Chevrolet Tahoe, silver in color with dark tinted windows." (Tr. 37.) Medics responded and Canty was pronounced dead at the scene.

{¶ 4} Testimony was also presented from Alexis Lewis, who, upon her release from jail in January 2012, began residing with Ashley Morrison at 2734 Vida Place. According to Lewis, Canty, also known as "Dan Dan," lived next door to them. At 1:00 a.m. on May 16, 2012, Lewis, Morrison, John McCreary, and Andrea Finley were at 2734 Vida Place, and, according to Lewis, appellant arrived at approximately 2:30 a.m. Lewis described appellant as acting "[o]bnoxious, demanding, kind of like in charge," causing Lewis to ask appellant to leave. (Tr. 74.) Lewis testified appellant left without incident, and Lewis went into the kitchen. Lewis then heard a conversation outside causing her to open the front door. Through the screen door, Lewis saw appellant and Canty in the middle of the street. Lewis testified as follows:

> And they talked for a second in the middle of the street. And [appellant] started walking to his truck and [Canty] followed.
>
> And [appellant] got in his truck and rolled the window down. And [Canty] was standing right up next to his truck and they talked for a second. The conversation must have ended. [Canty] turned around to walk away. And [appellant] must have said "Dan" or something. He turned around, and that's when he started shooting him.
>
> Q. What did you see next?
>
> A. [Canty] tried to run away and he fell face first on the ground.

(Tr. 75-76.)

{¶ 5} Lewis called 9-1-1, and another neighbor ran out to help Canty. Lewis was interviewed by police on three occasions. The first interview occurred at the scene just

after the shooting. At that time, Lewis told police she heard five or six shots and saw a light-colored SUV leaving the scene, but she did not see anything else because she was in the kitchen making a sandwich when the shooting happened. The second interview was at police headquarters at approximately 7:30 a.m. on May 16. At this time, Lewis named appellant as the shooter, provided a physical description of him, and selected him out of a photo array. Lewis testified at trial that she was not forthcoming about all the details of the shooting at this time. The third interview also occurred on May 16, and at this interview, Lewis again indicated appellant was the shooter. Lewis's trial testimony was similar to the full description of events she provided police at this third interview. At trial, Lewis testified she lied and was not fully forthcoming with police because she was afraid for her safety and that of her family.

{¶ 6} Nathaniel Sims, Jr., testified he was on the couch listening to music in the early morning hours of May 16, 2012 when he heard four gunshots. When he looked out the window, Sims saw the driver of a truck roll up the window and "skirt[ ] out" of the area. (Tr. 450.) Sims described the truck as a 2003 gray Tahoe. After the truck left, Sims testified he ran outside where the victim was laying on the ground bleeding. Therefore, Sims took off his shirt and handed it to another man who was attempting to stop the bleeding.

{¶ 7} As a result of the information obtained throughout the morning, an arrest warrant was issued for appellant. Appellant was arrested at his address, 483 South Ogden, at approximately 10:30 a.m. on May 16. Appellant told police he lived at 483 South Ogden with his mother and stepfather. During his interview with police, appellant denied having anything to do with Canty's death.

{¶ 8} Columbus Police Detective Glen Siniff testified a search warrant was executed at 483 South Ogden shortly after appellant's arrest. A box containing marijuana and some pills, $9,000 in cash, and several pieces of gold jewelry were found in a bedroom. A 2003 gold Chevrolet Tahoe, titled to appellant, was parked in the back of the residence. Detective Siniff testified that, though the vehicle looked as if it had been cleaned, he noticed a small spot on the driver's side door of what appeared to be blood. The spot was tested, and the vehicle was impounded.

{¶ 9} Testing of the spot concluded it was blood. The DNA profile extracted from the blood was consistent with Canty's DNA. Several fingerprints were taken from the vehicle but only two were identified. Three of the six fingerprint lifts taken from the vehicle matched either appellant or a man named Tony Marcum. The remaining fingerprints lifts were not able to be identified. A search of the vehicle revealed a bucket containing cleaning supplies and rags. Additionally, the driver's side visor had several spots that tested presumptive positive for blood but from which no DNA profiles could be extracted.

{¶ 10} Allie Hunt, appellant's mother, testified that, at approximately 11:00 p.m. on May 15, appellant left in a truck to pick up a mattress and box springs, but that he was not driving the Tahoe when he left. Hunt could not recall what time appellant returned, but that he did so to unload the mattress and box springs and then left again to return the truck. Hunt testified the Tahoe was parked in the back of the residence at 1:40 a.m., and she believed appellant was home at that time. Hunt did not see appellant until the next morning at approximately 9:30 a.m. and nothing was out of the ordinary. Hunt also testified the money found in the house belongs to her and her husband. According to Hunt, they had been saving that money over seven years for home repairs and to get the roof fixed. Hunt also testified the marijuana and pills found at the house belonged to her husband.

{¶ 11} The jury returned a verdict of guilty on the murder charge, as well as the specifications for use of a firearm and discharging a firearm from a motor vehicle. Thereafter, the trial court found appellant guilty of WUD and the RVO specification. A sentencing hearing was held, and appellant was sentenced to an aggregate prison term of 31 years to life. A judgment reflecting the same was filed on November 16, 2012.

## II. ASSIGNMENTS OF ERROR

{¶ 12} In a timely appeal, appellant presents seven assignments of error for our consideration:

> [I.] Misconduct and overreaching by the prosecutor deprived Defendant-Appellant of a fundamentally fair trial and reliable jury verdict in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

[II.] The trial court committed reversible error when it denied Defendant-Appellant's motion to suppress evidence that was seized from his motor vehicle in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

[III.] The cumulative effect of the trial court's erroneous evidentiary and procedural rulings deprived Defendant-Appellant of his due process right to a fundamentally fair jury trial under the Sixth and Fourteenth Amendments to the U.S. Constitution.

[IV.] The trial court's reception of new evidence to support the prior conviction elements of the weapon under disability count and the repeat violent offender specification after the trial court already terminated violated [sic] Defendant-Appellant's rights under the Double Jeopardy Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

[V.] Defendant-Appellant's convictions for murder and having a weapon under disability are against the manifest weight of the evidence.

[VI.] The jury's affirmative finding that Defendant-Appellant committed the offense of murder by discharging a firearm from a motor vehic[l]e is not supported by evidence sufficient to satisfy the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

[VII.] Defendant-Appellant was denied his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

## III. Discussion

### A. First Assignment of Error

{¶ 13} In his first assignment of error, appellant argues the prosecutor's misconduct and overreaching denied him a fair trial. Specifically, appellant alleges the prosecutor: (1) fabricated a drug-related motive for the shooting, (2) improperly placed Marcum's statements before the jury, (3) misrepresented trace evidence, and (4) improperly bolstered Lewis's testimony.

{¶ 14} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984); *State v. Howard*, 10th Dist. No. 08AP-177, 2009-Ohio-2663, ¶ 31. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The prosecutor's conduct cannot be grounds for a new trial unless the conduct deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405 (1993). In considering prejudice, we must consider the following factors: (1) the nature of the conduct, (2) whether counsel objected, (3) whether the court gave corrective instructions, and (4) the strength of the evidence against the defendant. *State v. Tyler*, 10th Dist. No. 05AP-989, 2006-Ohio-6896, ¶ 20.

{¶ 15} According to Lewis, McCreary was at Vida Place at the time of the shooting to smoke marijuana, but he was the only one in the house using drugs at that time. During her cross-examination, Lewis testified she was aware police believed Vida Place to be a "drug house," though she did not know if drugs were ever sold from the house, and, she stated, "[t]hey have no proof of that." (Tr. 125.) On further cross-examination, Lewis admitted people have told her Vida Place was known as a drug house. Lewis also testified that, though the police told her they thought the shooting had something to do with drugs, "[i]t had absolutely nothing to do with drugs." (Tr. 150.) According to Lewis, she did not know whether or not Canty was a drug dealer, but she knew Canty and appellant "did not do no type of business together" because "they weren't friends." (Tr. 151.) Evidence was also produced at trial that Canty had $4,331.49 in his pockets at the time of the shooting, and $9,000 in cash and multiple pieces of jewelry were recovered from appellant's residence. Additionally, drugs were found at Vida Place, and drugs were found at appellant's residence.

{¶ 16} According to appellant, prosecutorial misconduct occurred during closing arguments, wherein the prosecutor made the following statements:

> The judge told you I don't have to show why he did it. Just what he did, and what intention he had when he did it. I don't have to prove the why, just the what. And what he did was murder.

It is not an element of the offense.  But I would suggest to you, I would argue to you, look at what is found in our victim's pockets, over $4,300 in cash.

What can you infer James Daniel Canty did for a living based upon that?  All right.

And then looking at all of the facts and circumstances, look at what is found in his home, State's 12 and State's 13: $9,000 dollars; gold diamond encrusted jewelry.  His own mom admits it is his.  She said the nine grand is her and her husband's.  Never kept together.

What do you think he does for a living?  Do you think he is a quiet, Columbus State student?

I don't have to prove motive, ladies and gentlemen.  But I would argue to you the motive is pretty clear in this case.

(Tr. Vol. IV, 514.)

{¶ 17} Because appellant did not object to any portion of the closing argument of plaintiff-appellee, State of Ohio, we review for plain error.  A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice.  *Id.*  We may reverse only when the record is clear that a defendant would not have been convicted in the absence of the improper conduct.  *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).  Moreover, because the trial court instructed the jury the closing arguments were not evidence, we presume the jury followed the instruction and did not consider the closing arguments as evidence.  *State v. Trewartha*, 10th Dist. No. 05AP-513, 2006-Ohio-5040, ¶ 21, citing *State v. Raglin*, 83 Ohio St.3d 253, 264 (1998).

{¶ 18} A prosecutor is afforded a certain degree of latitude in his concluding remarks and may draw reasonable inferences from evidence at trial and may comment on those inferences during closing argument.  *State v. Hairston*, 10th Dist. No. 01AP-252 (Sept. 28, 2001), *appeal not allowed*, 94 Ohio St.3d 1433 (2002); *State v. Thomas*, 10th Dist. No. 02AP-778, 2003-Ohio-2199.  "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."  *Smith* at 14.  A

defendant is entitled to a new trial only when a prosecutor makes improper remarks and those remarks substantially prejudice the defendant.  *Id.*

{¶ 19} To determine if the alleged misconduct resulted in prejudice, we must consider " '(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant.' "  *Tyler* at ¶ 20, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995), *discretionary appeal not allowed*, 73 Ohio St.3d 1425 (1995).  In addition, the prosecutor's conduct must be considered in the context of the entire trial.  *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 151, citing *Keenan* at 410.  The touchstone of this analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, rather than the culpability of the prosecutor.  *Phillips* at syllabus.

{¶ 20} In appellant's view, the prosecutor's comments relied on facts not in evidence and required the jury to impermissibly stack inferences to reach the conclusion that drugs were the motive for the shooting.  However, a review of the challenged statements reveals the prosecutor did *not* say the shooting was drug related.  Rather, the prosecutor told the jury to infer what it wanted from the evidence presented.  Though the passage quoted above focuses on the money, when placed in context with all of the evidence presented throughout the trial, including evidence that Vida Place had a reputation as a "drug house," and drugs were found at both Vida Place and appellant's residence, we do not conclude the prosecutor's comments were improper.

{¶ 21} Because the prosecutor asked the jury to infer what it liked from the evidence presented, we reject appellant's argument that the prosecutor asked the jury to improperly stack inferences or that the prosecutor's comments were otherwise improper.  Further, even if we were to determine the prosecutor's comments consisted of improper innuendo, when viewing the prosecutor's comments in the context of the entire trial and in light of the instruction given by the trial court, along with the presumption that juries obey instructions from the court, we cannot conclude appellant's substantial rights were prejudicially affected here.

{¶ 22} Additionally, one of the factors to consider when assessing whether prejudice resulted from the alleged prosecutorial misconduct is the strength of the evidence against the defendant.  Here, the state presented testimony of a witness

claiming she saw appellant shoot Canty while Canty stood near the driver's side of appellant's Tahoe. The state also presented evidence that a blood spot on the driver's side door of the Tahoe contained a DNA profile matching that of Canty. Given the evidence presented, we cannot find prejudice even if the prosecutor's closing arguments are deemed to constitute misconduct.

{¶ 23} Appellant next contends the prosecutor improperly placed Marcum's statements before the jury.

{¶ 24} As indicated previously, three latent fingerprints taken from the Tahoe matched Marcum. According to Detective Siniff, prior to the fingerprints coming back as a match, Marcum's name had not been mentioned in the investigation. Based on the fingerprint testing, Detective Siniff testified he looked into Marcum's background, and the following exchange took place:

> Q. Did you find out things about Tony Marcum?
>
> A. Yes, sir.
>
> Q. Sir, do you know what a cleaner is?
>
> A. If you are talking about criminal activity, yes.
>
> Q. Tell the ladies and gentlemen of the jury what a cleaner is.
>
> A. A cleaner is somebody who goes to crime scenes and takes care of eliminating any possible evidence.
>
> Q. For who?
>
> A. For whoever hires him. Usually the person who committed the criminal act.
>
> * * *
>
> Q. Did you find out any information, through your background check or investigation of Mr. Marcum, whether Mr. Marcum has ever admitted to anyone to being a cleaner?
>
> A. Yes, sir.
>
> Q. What was that information?

[Appellant's Counsel]: Objection, Your Honor. No foundation. We need a foundation before we get into speculation like this. I don't know who he has talked with.

THE COURT: Sustained.

[Appellant's Counsel]: Hearsay on top of hearsay.

THE COURT: Sustained.

Q. Did you talk to Dave DeVillers of the U.S. Attorney's Office?

A. No, sir.

Q. Did you find out that this person had talked to Dave DeVillers of the U.S. Attorney's Office?

A. Yes, sir.

Q. Did you talk to the detective that has had contact with Tony Marcum before?

A. Yes, sir.

[Appellant's Counsel]: Your Honor, once again, if they are going to try to bring someone else in, they ought to bring the people in and not talk to another person. I have no objection if he wants or bring in these people that say Tony Marcum done these things if he can tie it into this scene. We are talking speculation and hearsay on top of hearsay.

(Tr. 301-02.)

{¶ 25} Thereupon, a side bar was held and testimony resumed.

{¶ 26} On appeal, appellant states, "the prosecutor elicited testimony that Marcum had spoken with an Assistant United States Attorney and admitted being a 'cleaner.' " (Appellant's brief, 15-16.) Contrary to appellant's assertion, as the record demonstrates, Detective Siniff was asked if he was aware of whether Marcum admitted to anyone to being a cleaner, but Detective Siniff did not testify Marcum made this admission and/or to whom it was made. Moreover, the trial court sustained the objections of appellant's counsel, and the trial court later instructed the jury "not [to] speculate as to why the court sustained an objection to any question or what the answer

to that question might have been." (Tr. 504.) The trial court reinforced the instruction by advising the jury not to "draw any inference or speculate on the truth of any suggestion included in a question that was not answered." (Tr. 504.) The jury is presumed to follow the court's instruction. *Raglin* at 264, citing *State v. Goff*, 82 Ohio St.3d 123, 135 (1998). Because the court sustained appellant's objections to the questions and instructed the jury concerning the effect of the sustained objections, appellant fails to demonstrate the necessary prejudice. *See State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94 (concluding prosecution's reference to the subject matter of a suppression hearing lacked prejudicial effect because the court sustained defendant's objection to the reference).

{¶ 27} Appellant also challenges the prosecutor's questions posed to appellant's mother, wherein the following exchange occurred:

Q. Have you talked to Tony Marcum since this happened?

A. Yes, I have.

Q. You told Tony Marcum that, in fact, when your son came home in the early morning hours of May 16th, he immediately took his clothing off and threw them in the washer.

A. Heavens, no, I never told Tony Marcum nothing like that.

Q. You told Tony Marcum that your son immediately took a shower.

A. I never told Tony Marcum that.

Q. And that he washed his hands with bleach.

A. I did not tell Tony Marcum nothing of the sort.

Q. Why would Tony Marcum say such things?

A. I have no idea.

* * *

Q. And can you give us why Tony Marcum would say such things about your conversation?

A. No.

(Tr. 492-93.)

{¶ 28} Appellant did not object to this questioning during trial; therefore, we review this issue using a plain-error analysis pursuant to Crim.R. 52(B). *State v. Saleh*, 10th Dist. No. 07AP-431, 2009-Ohio-1542, ¶ 68 (no objection to alleged prosecutorial misconduct during cross-examination reviewed under plain-error standard).

{¶ 29} Here, appellant's mother testified on direct examination that she had not seen appellant after he came home and delivered the box springs and mattress set at some point after 11:00 p.m. on May 15. While this attempt at impeachment may have involved inadmissible hearsay, such questioning does not rise to the level of prosecutorial misconduct. In *State v. Gillard*, 40 Ohio St.3d 226 (1988), *certiorari denied*, *Gillard v. Ohio*, 492 U.S. 925 (1989), the Supreme Court of Ohio found that a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists. Inasmuch as the prosecutor's good-faith basis for asking the question was never challenged, the court must presume she had one. *Id.* at 231. *See also State v. Finkes*, 10th Dist. No. 01AP-310 (Mar. 28, 2002); *Columbus v. Marchand*, 10th Dist. No. 95APC04-430 (Oct. 12, 1995); *State v. Ferguson*, 10th Dist. No. 95APC03-347 (Sept. 19, 1995).

{¶ 30} Consequently, we cannot conclude this line of questioning constituted prosecutorial misconduct or that appellant's substantial rights were prejudicially affected by the same.

{¶ 31} Appellant also contends the prosecutor misrepresented the testimony of the state's trace evidence expert. It is not disputed that the only item of appellant's to undergo gunshot residue ("GSR") testing was a pair of batting gloves recovered from appellant's home. Test results indicated particles highly indicative of GSR were not present on the gloves. In his opening and closing statements, appellant's counsel referred to the police investigators' failure to test for GSR on appellant's person, clothing or Tahoe. During the rebuttal argument, the prosecutor stated:

> That is why we brought a GSR expert in to explain to you how fragile that evidence is. It's microscopic. You can get rid of it like by rubbing your hands. That is why they say the sooner the better. *That is why they say if it is outside two to*

> *four hours, don't bother looking for it because you are not going to find it. That is why they didn't test him. That is why they didn't test the car.* It is well past that time frame of when you would expect to find anything.

(Emphasis added.) (Tr. 550.)

{¶ 32} From this quoted passage, appellant challenges the emphasized statements. It is appellant's position that the GSR expert did not provide such testimony.

{¶ 33} As part of its case-in-chief, the state presented the testimony of Matthew Congleton, a trace evidence analyst in the laboratory section of the Ohio Bureau of Criminal Investigation ("BCI"). While we agree Congleton did not testify to any specific time frame regarding the collection of GSR samples, Congleton did testify that for testing the presence of GSR, he instructs police officers that he prefers "to see them collect their samples as soon as is reasonably possible." (Tr. 430.) Congleton also testified that GSR is lost "when someone is driving. They are rubbing the steering wheel or moving around in the vehicle." (Tr. 434.) Further, Congleton stated, "[t]he more movement, the more rubbing, the more interaction, the less likely that that gunshot residue is going to still be there to be found." (Tr. 438.)

{¶ 34} Additionally, Detective Siniff was asked, "[a]re you aware, based on your training and experience, whether there is a time frame in which this should be collected?" (Tr. 306.) To which Detective Siniff responded, "I know it has to be collected within two, maybe four hours at the tops." (Tr. 306.)

{¶ 35} In the prosecutor's rebuttal closing, he references why "they" did not perform a GSR test on appellant or the Tahoe, and, as the evidence established, it is the investigators that determine what evidence to submit for testing. Thus, the statement regarding the two-to-four hour window appears to be based on the testimony of Detective Siniff, not Congleton. Therefore, we do not find the prosecutor misrepresented Congleton's testimony.

{¶ 36} Lastly, under this assigned error, appellant argues the prosecutor introduced prior consistent statements of Lewis in order to bolster her testimony. In appellant's view, the "basic tenor" of the state's questioning was Lewis initially lied to police, but, by the time of her third interview, provided police with statements that were

consistent with her trial testimony. (Appellant's brief, 20.) Appellant argues the use of her prior statements given at each police interview, specifically that appellant was the shooter, was improper. Appellant's counsel did not object to this line of questioning, and, therefore, we review for plain error.

{¶ 37} Evid.R. 801(D)(1)(b) authorizes the admission of prior consistent statements that are offered to rebut charges that the testimony is influenced by an improper reward. It provides:

> **(D) Statements which are not hearsay.**
>
> A statement is not hearsay if:
>
> **(1) Prior statement by witness.**
>
> The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive."

(Boldface sic.)

{¶ 38} During his opening statement, appellant's counsel indicated the state has "one person who has given four different stories, Alexis Lewis. You promised me you would keep an open mind and assess the credibility of the witnesses, what they are saying and why they are saying it. That's going to be the key to this case." (Tr. 24.) Thereafter, appellant's counsel tells the jury witnesses will describe the vehicle as silver, gold, blue, "three or four different colored SUVs that drove away after the shooting. And only one person finally admitted that she saw the person in the car. She said it was [appellant]. And that was Alexis Lewis. Listen to the other three stories, and try to figure our why the fourth story she said it was him." (Tr. 26.)

{¶ 39} Defense counsel's opening statement implied that Lewis had been untruthful in her statements to police. This was an allegation of recent fabrication or improper influence that allowed the state to introduce Lewis's prior consistent statements to rehabilitate her testimony. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 110, citing *State v. Wolff*, 7th Dist. No. 07 MA 166, 2009-Ohio-2897, ¶ 78

(allegations of recent fabrication during opening statement provided grounds for admitting prior consistent statement).

{¶ 40} Thus, we do not find prosecutorial misconduct occurred by the elicitation of Lewis's prior consistent statements.

{¶ 41} For all the foregoing reasons, we conclude appellant has not established prosecutorial misconduct. Accordingly, appellant's first assignment of error is overruled.

### B. Second Assignment of Error

{¶ 42} In his second assignment of error, appellant argues the trial court erred in denying his motion to suppress. Specifically, appellant sought to suppress all evidence seized from his gold Chevrolet Tahoe located at the residence named in the search warrant. According to appellant's suppression motion, the search warrant at issue was limited to the premises known as 483 South Ogden, Columbus, Ohio, and its curtilage; therefore, because the police lacked both a warrant and probable cause to search the Tahoe, the evidence seized from it was the result of an unconstitutional search and seizure. In appellant's view, the Tahoe was not within the curtilage of the home because the test established by *United States v. Dunn*, 480 U.S. 294 (1987), had not been met. The extent of a home's curtilage is resolved by considering four main factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the use to which the area is put, and (4) the steps taken to protect the area from observation by passersby. *Id.* at 301.

{¶ 43} The state argued the Tahoe was parked within the curtilage of the property named in the search warrant; thus, the Tahoe was within the scope of the search warrant. Alternatively, the state argued that, if found to be a warrantless search, the search was valid based upon the automobile exception, the exigent circumstances exception, the good faith exception, and the exception allowing for the seizure of evidence within plain view.

{¶ 44} A suppression hearing was held on September 25, 2012, and the state called three witnesses to testify: Detective Joseph J. Landis, Detective Glen Siniff, and Detective Thomas Burton. According to Detective Landis, Lewis described the vehicle

involved in the shooting as a gold Chevrolet Tahoe with large custom rims and big tires. Detective Landis was also told Canty was standing next to the driver's side door of the Tahoe when he was shot by the driver.

{¶ 45} When police arrived to execute the search warrant at 483 South Ogden shortly after appellant's arrest, a gold Chevrolet Tahoe was parked behind the home. The back of the house was described as having a large backyard that went to an alley. A chain link fence enclosed the yard, and the Tahoe was parked in a gravel cutout on the other side of the chain link fence. Other than the gravel area, the house did not contain a garage or driveway. According to Detective Landis, though on the other side of the chain link fence, this gravel area was part of the yard of the house. Detective Siniff also testified the Tahoe was not parked in the alley, but was parked in a graveled area that was part of the backyard. Detective Burton described the area as not in the alley or in a public street, but in a parking spot made for that house. In Detective Burton's estimate, the Tahoe was 25 feet from the house.

{¶ 46} According to Detective Siniff, he noticed the spot of what appeared to be blood on the driver's side door of the Tahoe within ten minutes of arriving at 483 South Ogden. Detective Burton testified that to see the spot, one would "probably have to walk up on the car three feet away." (Motion to Suppress Tr., 54.)

{¶ 47} The trial court concluded the Tahoe was located within the curtilage of the premises named in the search warrant and that the evidence would have inevitably been discovered due to the subsequent impounding of the vehicle. Therefore, the trial court denied appellant's motion to suppress.

{¶ 48} The Fourth Amendment to the U.S. Constitution, as applied to the states through the Fourteenth Amendment, and Ohio Constitution, Article I, Section 14, requires adherence to judicial processes and proscribes unreasonable searches and seizures. *United States v. Ross*, 456 U.S. 798, 825 (1982); *State v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 19. Searches conducted outside the judicial process, without a warrant, are "per se unreasonable" under the amendment and "[e]vidence is inadmissible if it stems from an unconstitutional search or seizure." *Id.* at ¶ 19, citing *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993), quoting *Thompson v. Louisiana*, 469 U.S. 17, 20 (1984); *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). However,

the warrant requirement is subject to a " ' "few specifically established and well delineated exceptions." ' " *Dickerson* at 372, quoting *Thompson* at 19-20, quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). "Those seeking exemption from the warrant requirement bear the burden of establishing the applicability of one of the recognized exceptions." *State v. Fisher*, 10th Dist. No. 10AP-746, 2011-Ohio-2488, ¶ 17, citing *State v. Lowry*, 4th Dist. No. 96CA2259 (June 17, 1997).

{¶ 49} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility." *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). As such, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence. *Id.*, citing *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the reviewing court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard." *Id.*, citing *Burnside* at ¶ 8, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶ 50} On appeal, appellant argues the validity of the search and seizure turns on whether the Tahoe was located within the curtilage of 483 South Ogden and again relies on *Dunn* in support of his position that the Tahoe was not within the curtilage of the property. The only factor of the four listed in *Dunn* that appears to weigh in appellant's favor is that the Tahoe was parked on the other side of the chain link fence, as the remaining evidence at the suppression hearing indicates the gravel cutout on which the Tahoe was parked is actually part of the home's yard. Regardless, even assuming we were to find in appellant's favor that the Tahoe was not within the curtilage of the residence named in the search warrant, the state met its burden of establishing the automobile exception, and the plain-view exception justified the seizing of evidence from the Tahoe.

{¶ 51} Pursuant to the plain-view exception, "police may seize evidence in plain view during a lawful search if (1) the seizing officer is lawfully present at the place from

which the evidence can be plainly viewed; (2) the seizing officer has a right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *State v. Alihassan*, 10th Dist. No. 11AP-578, 2012-Ohio-825, ¶ 11, citing *Horton v. California*, 496 U.S. 128, 136-37 (1990).  In determining whether it is immediately apparent that an object or item is incriminating on its face, paragraph three of the syllabus in *State v. Halczyszak*, 25 Ohio St.3d 301 (1986), holds, "[t]he 'immediately apparent' requirement of the 'plain view' doctrine is satisfied when police have probable cause to associate an object with criminal activity."

{¶ 52} The evidence presented at the suppression hearing indicated the detectives were on the property of 483 South Ogden to execute a search warrant and they saw the Tahoe that matched the description of the vehicle given by witnesses at the scene of the shooting.  The spot of suspected blood was on the driver's side door, which is where Lewis described Canty standing at the time he was shot.  Though described as small in nature, the spot was able to be seen by walking near and around the vehicle.  Thus, the spot of suspected blood was seized lawfully pursuant to the plain-view exception to the warrant requirement.  *State v Bazrawi*, 10th Dist. No. 12AP-1043, 2013-Ohio-3015, ¶ 33.

{¶ 53} The automobile exception also justified the officers' actions here.  The automobile exception is a " 'specifically established and well delineated' " exception to the warrant requirement.  *Id.* at ¶ 18, quoting *Ross* at 825, citing *Carroll v. United States*, 267 U.S. 132 (1925).  "[U]nder the automobile exception to the warrant requirement, the police may search a motor vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband."  *State v. Battle*, 10th Dist. No. 10AP-1132, 2011-Ohio-6661, ¶ 33.  Courts define probable cause in the context of an automobile search as " ' "a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." ' "  *State v. Parrish*, 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 27, quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), quoting *Carroll* at 149.  Accordingly, "[t]he determination of probable cause is fact-dependent and turns on what the officer knew at the time he made the stop and/or search."  *Battle* at ¶ 34.

{¶ 54} Here, probable cause was supported by the following.  As stated under our discussion of the plain-view exception, the state elicited testimony at the suppression hearing that the Tahoe matched the description of the vehicle given by witnesses at the scene of the shooting.  Additionally, the detectives testified the spot of suspected blood matched the location of where Canty was described as standing when he was shot.  Further, Detective Siniff testified that, in this case, a small amount of blood would "have just as much relevancy to me as a large amount of blood."  (Motion to Suppress Tr., 45.)  Thus, this record contains sufficient probable cause to believe the Tahoe contained evidence of a crime, and, therefore, the automobile exception justified the search and seizure of the spot of suspected blood.

{¶ 55} For all the foregoing reasons, we conclude the trial court properly denied appellant's motion to suppress and, accordingly, overrule his second assignment of error.

### C.  Third Assignment of Error

{¶ 56} Under his third assignment of error, appellant argues the cumulative effect of the trial court's erroneous evidentiary and procedural rulings denied him his constitutional right to a fair trial.  The first of such alleged errors is the trial court's qualifying Devonie Murphy, forensic scientist in the DNA section of BCI, as an expert witness.

{¶ 57} Under Evid.R. 702(B), an expert may be qualified by reason of his or her specialized knowledge, skill, experience, training or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue.  Neither special education nor certification is necessary to confer expert status upon a witness.  *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 32.  The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its factfinding function.  *Id.* at ¶ 113, citing *State v. Baston*, 85 Ohio St.3d 418, 423 (1999).

{¶ 58} Pursuant to Evid.R 104(A), the trial court determines whether an individual qualifies as an expert and that determination will be overturned only for an abuse of discretion.  *Id.* at ¶ 114, citing *State v. Williams*, 4 Ohio St.3d 53, 58 (1983).  An abuse of discretion connotes more than a mere error of law or judgment; it implies that

a decision was arbitrary, unconscionable or unreasonable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). Evid.R. 702 governs the admission of expert testimony and reads:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 59} "Qualifications which may satisfy the requirements of Evid.R. 702 are multitudinous." *State v. Mack*, 73 Ohio St.3d 502, 511 (1995). The Supreme Court of Ohio has held that there is no "degree" requirement, per se. *Id.* Professional experience and training in a particular field may be sufficient to qualify one as an expert. *Id.*, citing *State v. Beuke*, 38 Ohio St.3d 29, 43 (1988).

{¶ 60} During her voir dire, Murphy testified she began her employment at BCI in February 2011. Murphy's educational background includes a bachelor's of science degree in biological sciences and master's of science degree in forensic science. Additionally, Murphy testified she completed a six-month, in-house training program at BCI, consisting of readings, lectures, written and oral exams, and had attended "numerous workshops and conferences" sponsored by the Federal Bureau of Investigation and the American Academy of Forensic Sciences and the Mid-Atlantic Association of Forensic Sciences. (Tr. 361.) Murphy also testified she has performed DNA analysis "hundreds of times" and has been a member of the American Academy of Forensic Sciences since 2009. (Tr. 362.) After the voir dire and review of Murphy's curriculum vitae, the trial court qualified Murphy as an expert in her field.

{¶ 61} The essence of appellant's challenge to Murphy being qualified as an expert is that, other than stating she was trained by the director of training at BCI, who is qualified in DNA analysis and has testified in court regarding DNA, Murphy was unable to offer any information regarding the background and qualifications of the

director of training at BCI. This, however, is not a requirement under Evid.R. 702 or *Drummond.* Rather, the individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its factfinding function. *Id.* at 32. Given the evidence presented, we find no abuse of discretion in the trial court's decision qualifying Murphy as an expert.

{¶ 62} Also under this assigned error, appellant argues the trial court erroneously admitted a "prison photo" and erroneously denied a mistrial. Both of these alleged errors are reviewed under an abuse of discretion standard. *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 58 (the admission or exclusion of relevant evidence rests within the sound discretion of the trial court); *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001) (the granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion).

{¶ 63} The alleged error regarding the photograph pertains to the state's admission of a photograph depicting appellant with two other men. According to Lewis, two photographs, one depicting appellant and Lewis's boyfriend, and one depicting appellant with two other unknown men, were found in the house on Vida Place. The photographs were introduced to establish appellant lied to police when he told them he did not know where Vida Place was. During the admission of exhibits, appellant's counsel objected to the admission of one of the photographs saying, "the picture of [appellant] and two other individuals * * * was taken in prison." (Tr. 445.)

{¶ 64} The trial court overruled the objection, noting the persons in the photograph are wearing "Bermuda shorts and other casual wear," and "there is nothing in the photograph that would indicate that anybody was incarcerated. And there is no stripes, no numbers, no guards, or anything like that." (Tr. 445, 446.) Our review of the record confirms the trial court's description. The photograph depicts three men standing in an area of grass in front of a red brick building. The men are dressed in shorts and t-shirts, and none of the clothing is of a matching nature. In short, there is nothing in the photograph to indicate the setting is one taken in prison.

{¶ 65} Accordingly, we find no abuse of discretion in the admission of the challenged photograph.

{¶ 66} Appellant's alleged error pertaining to his request for a mistrial concerns the following. On recross-examination, Lewis was asked why she became more at ease with police in the second and third interviews. Lewis responded, "Because I had spoken to them on the phone. I was more comfortable. Not only that, now he is incarcerated and can't hurt me physically." (Tr. 167.) Based on this statement, appellant's counsel moved for a mistrial. The trial court stated it would not grant the motion for mistrial, but provided a choice of either providing an instruction or saying nothing and moving forward.

{¶ 67} The following day, the jury was instructed:

> Before we get started with the next witness, yesterday Miss Lewis made a comment indicating that [appellant] is currently incarcerated. And sometime in the near future I will be instructing you on the law that you must follow when you are deciding whether the state has proven beyond a reasonable doubt that [appellant] is guilty of committing the crime of murder.
>
> The fact that [appellant] was or was not and/or is or is not incarcerated has nothing to do with his guilt or innocence. It is not an element of the crime of which he has been charged, and it cannot affect in any way your verdict.
>
> This is an instruction of law that I am giving to you. And you are required to follow the instructions of law that are presented to you by the court.

(Tr. 178.)

{¶ 68} Thereafter, the trial court polled each juror to inquire whether each would accept the instruction and follow it.

{¶ 69} " 'Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible.' " *State v. Harris*, 10th Dist. No. 04AP-612, 2005-Ohio-4676, ¶ 27, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). Moreover, a jury is presumed to follow curative instructions given to it by a trial judge. *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Upon our review of the record, we find no abuse of discretion in the trial court's refusal to grant a mistrial. The trial court instructed the jury that whether or not appellant is or was incarcerated has nothing to do with his guilt or innocence and it is not to affect their verdict any way. Additionally, though juries are

presumed to follow the trial court's instructions, the trial court polled the jury to assure it would comply with the same.  There is no indication in this case that the curative instruction was insufficient to negate any possible bias.  Thus, we conclude appellant has failed to demonstrate that he suffered material prejudice so that a fair trial was no longer possible.

{¶ 70} Lastly, under this assigned error, appellant contends it was error for the trial court to replace Juror No. 7 with an alternate juror after the jury had begun its deliberations.

{¶ 71} R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, [the original] juror becomes sick, or for other reason is unable to perform his duty."  As of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun.  However, "[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."  Crim.R. 24(G)(1).  A trial court's decision to remove or retain a juror is reviewed under an abuse of discretion standard.  *State v. Owens*, 112 Ohio App.3d 334, 336 (11th Dist.1996).

{¶ 72} The jury began its deliberations at 1:45 p.m., and by 2:30 p.m., the trial judge received a note stating that Juror No. 7 "has expressed reluctance to continue as a juror due to the fact she does not feel comfortable being in close proximity to the evidence (particularly the pictures of the victim).  She would like to be exchanged with one of the alternate jurors."  (Tr. 567.)  Based on this communication from the jury, the trial judge voir dired Juror No. 7 to determine the juror's concern.  The juror indicated she was not "comfortable being so close to the evidence," and the exhibits depicting "the dead person."  (Tr. 568.)  The prosecutor asked the juror, "[a]re you saying you wouldn't be able to look at the evidence in this case?," and the juror responded in the affirmative.  (Tr. 569.)  Juror No. 7 stated, "I was shaking when it was so close to me."  (Tr. 570.)  After the juror was voir dired, the trial judge excused Juror No. 7 and impaneled alternate Juror No. 13, who had not yet been excused.  Thereafter, all of the jurors were brought into the courtroom, and the trial judge instructed them to "start all over again" with their deliberations.  (Tr. 574.)  Appellant's counsel took part in the voir dire of

Juror No. 7 and did not object when the trial judge indicated "the appropriate solution" was to excuse Juror No. 7 and impanel Juror No. 13. (Tr. 572.)

{¶ 73} Upon review of the record, we find no error, plain or otherwise, in the trial court's decision to replace Juror No. 7 with Juror No. 13. During the voir dire and in the presence of appellant, both counsel and the trial court asked questions of Juror No. 7 pertaining to her ability to remain as a juror. Juror No. 7 indicated she was physically affected by the evidence and would not be able to look at the evidence presented and, for these reasons, was asking that she be excused. Once Juror No. 13 replaced Juror No. 7, the trial court instructed the jury to begin its deliberations anew. Accordingly, we do not find the trial court abused its discretion in removing Juror No. 7 as being unable to perform her duty as a juror.

{¶ 74} For all the foregoing reasons, appellant's third assignment of error is overruled.

### D.  Fourth Assignment of Error

{¶ 75} Under his fourth assignment of error, appellant argues the state's submission of evidence supporting the WUD charge and the RVO specification after the parties had rested their respective cases violated his constitutional double jeopardy rights.

{¶ 76} Appellant waived his right to a jury on the WUD charge, and, by statute, the RVO specification is to be determined by the trial court rather than a jury. R.C. 2941.149(B). In this case, at the conclusion of the state's case-in-chief, appellant's counsel made a Crim.R. 29 motion, which the trial court denied. The state rested, and appellant presented two witnesses. Thereafter, the defendant rested. After the completion of jury instructions and closing arguments, the jury commenced deliberations. After Juror No. 7 was replaced with Juror No. 13, deliberations resumed. Approximately, two and one-half hours later, the jury indicated a verdict had been reached. Prior to bringing the jury into the courtroom, the following discussion occurred:

> It is my intention to make my decision on [the WUD charge] on this coming Tuesday, the 13th. And in the event that the verdict by the jury is not guilty, that charge is pending. So, [appellant] would have to remain in jail because of that charge.

[Appellant's Counsel]:  Your Honor, if I may, there hasn't been any evidence introduced to support a WUD conviction, none.

THE COURT:  I am not dealing with the WUD at this point. I want to get this verdict and then we are going to deal with the WUD on Tuesday.

[Appellant's Counsel]:  That's fine.

(Tr. 575-76.)

{¶ 77} Thereafter, the verdicts were read and the jury was polled.  Court recessed and resumed the following Tuesday, at which time the following discussion occurred:

THE COURT: * * * The first [issue] is [appellant] waived his right to have a jury trial on Count Two, which is a weapon under disability.  And there was a stipulation by counsel that the prosecutor would be allowed to enter certain exhibits that have relevance to that count.

* * *  The [other] obligation is to determine whether or not the sentencing of the underlying case, being Counts 1 and 2 with a specification, also include a determination that would be made by the court as regards to whether or not the defendant is a repeat violent offender.

(Tr. 581-82.)

{¶ 78} The state offered an exhibit consisting of a certified copy of a prior judgment entry finding appellant guilty of felonious assault with a firearm specification. The state also asked that the trial testimony and exhibits be moved into evidence as to the WUD count.

{¶ 79} Appellant's counsel stated, "when [the state] rested, his case is over. I think it is totally inappropriate at this point in time to be introducing additional evidence against [appellant].  I think it is inappropriate for the court to consider the WUD at this point in time and a repeat violent offender, as well."  (Tr. 583.)  In response, the court stated the record would speak for itself, but because the jury verdict came back late in the day on Friday, the court recessed until Tuesday, the next working day, and this did not constitute a reopening of appellant's case.  The court went on to state:

The case was alive and active over the weekend and it resumed this morning. So, there wasn't any foreclosure in the court's mind. I never intended to foreclose the state's right. And, in fact, the state raised the issue of continuing the case on Friday for the presentation.

And my words were something to the effect that the court will take that evidence on [Tuesday]. So I think the record is clear that what we are doing here today is a continuation if what happened on Friday. And there is no reopening of the case that court is facing.

(Tr. 584.)

{¶ 80} Appellant recognizes that whether a state's case-in-chief may be reopened for the presentation of further evidence is within the sound discretion of the trial court. *Columbus v. Grant*, 1 Ohio App.3d 96, 97 (10th Dist.1981). Nonetheless, appellant argues double jeopardy principles foreclose the reopening of the prosecutor's case-in-chief after the trial court has ruled on a Crim.R. 29 motion for acquittal and the trial has terminated.

{¶ 81} In support, appellant relies on *State v. Lovejoy*, 79 Ohio St.3d 440 (1997). In that case, the defendant waived his right to a jury trial with respect to the WUD charge and the remaining charges were tried to a jury. After being unable to reach a verdict, the trial judge ordered a mistrial due to a hung jury and found the defendant guilty of WUD. Subsequent to the finding of guilty, the trial judge sua sponte reopened the evidence to consider evidence of a prior felony conviction. Specifically, the trial judge took judicial notice of the clerk's docket and reaffirmed his finding of guilty on the WUD charge.

{¶ 82} The appellate court held it was error for the trial court to sua sponte reopen the evidence and take judicial notice of prior proceedings to supply evidence of a fact the state failed to prove. Therefore, the appellate court ordered that the defendant be retried on the WUD charge. The Supreme Court of Ohio disagreed. The court in *Lovejoy* reviewed the history and purpose of double jeopardy as follows:

It is well established that the Double Jeopardy Clause protects against successive prosecutions for the same offense. *United States v. Dixon* (1993), 509 U.S. 688, 696, 113 S. Ct. 2849, 2855, 125 L. Ed. 2d 556, 567. It protects a person who has been acquitted from having to run the

gauntlet a second time. *Ashe v. Swenson* (1970), 397 U.S. 436, 445-446, 90 S. Ct. 1189, 1195, 25 L. Ed. 2d 469, 476-477. As stated in *Green v. United States* (1957), 355 U.S. 184, 187-188, 78 S. Ct. 221, 223, 2 L. Ed. 2d 199, 204:

> The underlying idea [embodied in the Double Jeopardy Clause], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Id.* at 443.

{¶ 83} Therefore, the court in *Lovejoy* concluded a retrial on the WUD charge would give the state a " 'second bite at the apple' " and that double jeopardy applied to prevent a retrial on said charge. *Id.* at 450.

{¶ 84} As our citation to the record reflects, this case presents a scenario significantly different than that presented in *Lovejoy*. To prevail on a double jeopardy claim, a defendant must show there has been an event, such as an acquittal, which terminates the original jeopardy. *State v. Whiteside*, 10th Dist. No. 08AP-602, 2009-Ohio-1893, ¶ 15, citing *Richardson v. United States*, 468 U.S. 317, 325 (1984). In this case, there had not been an event to terminate the original jeopardy on the WUD charge and RVO specification at the time the state submitted evidence of appellant's prior conviction. Rather, the trial court allowed the state to introduce evidence of a charge for which appellant waived his right to a jury and for which there had not yet been a finding made. Therefore, appellant's reliance on *Lovejoy* is misplaced, and we conclude double jeopardy principles do not apply in this instance to bar the court's finding of guilty on the WUD charge and the RVO specification.

{¶ 85} Accordingly, appellant's fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 86} Appellant's fifth assignment of error challenges the weight of the evidence supporting his convictions for murder and WUD. Specifically, appellant argues that the testimony offered by Sims and Lewis lacked the credibility necessary to sustain a conviction for murder and WUD.

{¶ 87} In determining whether a verdict is against the manifest weight of the evidence, an appellate court sits as the "thirteenth juror" and must weigh the evidence to determine whether the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). The appellate court must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances when "the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 88} Appellant was prosecuted for the offense of murder with specifications and WUD. The elements of murder are set forth in R.C. 2903.02(A), which states in relevant part that "[n]o person shall purposely cause the death of another." R.C. 2923.13 prohibits a person from knowingly acquiring, having, carrying or using any firearm or dangerous ordnance, if the person "has been convicted of any felony offense of violence." R.C. 2923.13(A)(2).

{¶ 89} The evidence adduced at trial established appellant, while sitting in the driver's seat of the Tahoe, shot Canty as Canty stood outside on the street. According to Lewis, she saw appellant enter the Tahoe, roll down the window, and shoot Canty as he turned in appellant's direction. Though Canty tried to run away, Lewis testified Canty fell to the ground, and appellant drove away from the scene. Lewis also testified she had seen appellant in the Tahoe on prior occasions, and it was the vehicle he always drove.

{¶ 90} Sims provided testimony that, upon hearing multiple shots, he looked out the window to see the driver of a Tahoe roll the driver's side window up and leave the scene. Sims described to police at the scene that the Tahoe was a "2003 gray Tahoe." (Tr. 450.) At trial, Sims identified the photograph of appellant's Tahoe as the one he

saw leaving the murder scene, but stated the rims of the Tahoe in the photograph were not on the Tahoe the night of the murder.

{¶ 91} Appellant challenges Sims' credibility and asserts Sims "was very adamant that the vehicle depicted in the police photographs of [appellant's] Chevy Tahoe was <u>not</u> the one used by the shooter." (Emphasis sic.) (Appellant's brief, 42.) In our view, this is a mischaracterization of Sims' testimony. On direct examination, Sims testified he did not see "fancy rims" on the Tahoe the night of the murder. On cross-examination, Sims testified the Tahoe he saw did not have any rims on it. On redirect examination, Sims stated, "[a]ll I saw was factory wheels on it." (Tr. 464.) Further, Sims testified, "[t]hat is the truck I saw. It's got to be. It has got different rims on it." (Tr. 465.) Although appellant argues the inconsistencies in Sims' testimony detract from his credibility, " '[i]t is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.' " *State v. Haynes*, 10th Dist. No. 03AP-1134, 2005-Ohio-256, ¶ 24, quoting *State v. Lakes*, 120 Ohio App. 213, 217 (4th Dist.1964).

{¶ 92} Appellant also attacks Lewis's credibility and argues her testimony suffers from "defects, conflicts, and inaccuracies." (Appellant's brief, 43.) Specifically, appellant points to Lewis's admission of past drug use, timeline discrepancies, lying to police, evasiveness of cross-examination, and her refusal to speak with the defense investigator prior to trial. Appellant also directs us to the recording of Lewis's 9-1-1 call in which Lewis can be heard asking someone at the scene, "what should I say, what should I say?" (Appellant's brief, 45.)

{¶ 93} Lewis testified as to each of these issues. According to Lewis, she had a drug addiction to opiate pain medications, but had not used since her release from jail in January 2012 nor had she used any at the time of the shooting. Lewis admitted not being completely truthful during the first two interviews with police, but testified she lied and withheld information because she was afraid for her safety. Lewis also testified she declined to speak with the defense investigator prior to trial because she did not "want to talk to anybody who is going to work for [appellant] and help him." (Tr. 110.) Regarding the 9-1-1 call, Lewis stated she did not know what to say. Lewis explained, "I have never been in this situation before. I am 21 years old. I grew up in the suburbs. I

have never had to see somebody I love get shot and killed. I don't know what I am supposed to say." (Tr. 141.) Thus, the trier of fact was aware of each of these issues, and it was within the province to the trier of fact to determine Lewis's credibility and the weight to be given to her testimony. *DeHass.*

{¶ 94} Regarding the alleged timeline discrepancies, Lewis testified appellant arrived at Morrison's at approximately 2:30 a.m. and stayed until approximately 3:00 a.m., but, according to police reports, the shooting occurred just before 4:00 a.m. We reiterate, however, that " '[i]t is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.' " *Haynes* at ¶ 24, quoting *Lakes* at 217. Appellant also asserts Lewis's "evasiveness" on cross-examination renders her testimony suspect. A manifest-weight review requires the appellate court to "bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses." *State v. Mickens*, 10th Dist. No. 08AP-626, 2009-Ohio-1973, ¶ 30; *DeHass* at paragraph one of the syllabus. Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest-weight grounds. *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 95} Upon careful review of the record presented before us, we conclude appellant's arguments regarding the credibility of the state's witnesses does not render their testimony not credible as a matter of law such that a reversal on manifest-weight grounds is required. Accordingly, appellant's convictions for murder and WUD are not against the manifest weight of the evidence, and we overrule appellant's fifth assignment of error.

### F. Sixth Assignment of Error

{¶ 96} In his sixth assignment of error, appellant contends the record contains insufficient evidence to support the conviction for the specification of discharging a weapon from a motor vehicle.

{¶ 97} In contrast to assessing the weight of the evidence, an appellate court does not act as a "thirteenth juror" in determining the sufficiency of the evidence. *State v. New*, 197 Ohio App.3d 718, 2012-Ohio-468, ¶ 8 (10th Dist.). Rather, "[t]he issue of sufficiency presents a purely legal question for the court regarding the adequacy of the

evidence." *Id.*, citing *Thompkins* at 386. The relevant inquiry is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 98} R.C. 2941.146(A) contains a firearm specification that adds a five-year prison term when a defendant commits a felony that includes the element of purposely or knowingly causing or attempting to cause the death of or physical harm to another, if the crime " 'was committed by discharging a firearm from a motor vehicle other than a manufactured home.' " *State v. Swidas*, 133 Ohio St.3d 460, 2012-Ohio-4638, ¶ 1, quoting R.C. 2941.146(A).

{¶ 99} According to appellant, Lewis's testimony established that appellant shot Canty from inside the Tahoe while the vehicle was still stationary and that appellant drove away from the scene after he discharged the firearm. Because no evidence was presented that the vehicle was moving at the time appellant discharged the firearm, appellant argues there is insufficient evidence to support his conviction under R.C. 2941.146(A).

{¶ 100} Initially, we note that, contrary to appellant's position, R.C. 2941.146(A) concerns discharging a firearm from a motor vehicle, not only discharging a firearm from a *moving* motor vehicle. Hence, from the face of the statute, appellant's argument fails.

{¶ 101} Moreover, in *Swidas*, the Supreme Court of Ohio had occasion to address R.C. 2941.146 and "what the word 'from' means in the phrase 'from a motor vehicle.' " *Id.* at ¶ 16. Using the usual, normal or customary meaning of the word "from," the *Swidas* court stated the following:

> Webster's Third New International Dictionary 913 (3d Ed.1986) defines "from":
>
>> [U]sed as a function word to indicate a starting point: as (1) a point or place where an actual physical movement (as of departure, withdrawal, or dropping) has its beginning * * *.
>
> The Oxford English Dictionary 210-211 (2d Ed.1989) also defines "from": "Denoting departure or moving away:

governing a [substantive] which indicates a point of departure or place whence motion takes place."

Both definitions refer to a "point" or "place" whence something departs. In the statute, that point or place is "a motor vehicle." That place is not "the vicinity of a motor vehicle" or "near a motor vehicle." The statute requires that the starting point of the activity is the motor vehicle itself.

But a motor vehicle cannot fire a weapon; the statute applies to people. That does not obviate the statutory requirement that the locus of the discharge of the weapon is the motor vehicle itself. For the locus of the discharge to be the motor vehicle, then, the person discharging the weapon must have a substantial physical connection to the vehicle. If a person were in or on a vehicle to the extent that the vehicle was providing substantial support to the person, the locus of that person's firing of the weapon would be the motor vehicle. Without a substantial physical connection to the vehicle, a shooter cannot be said to have fired a shot that commenced from the motor vehicle.

*Id.* at ¶ 18-21.

{¶ 102} Because the evidence in *Swidas* established that the defendant was standing outside of the vehicle and no part of the defendant was on the vehicle at the time he discharged the firearm, the court held R.C. 2941.146 is not applicable when a person fires a weapon while standing completely outside a motor vehicle. *Id.* at ¶ 1. In so holding, the court reiterated that "[t]he key to a violation under R.C. 2941.146 is the location of the shooter at the time of the shooting." *Id.* at ¶ 23. "Strictly construing the statute in favor of the accused limits the reach of the statute to persons shooting a firearm from the vehicle itself, not from nearby. The only conduct that is clearly proscribed by the statute is discharging a firearm while the person firing the weapon is in or on a motor vehicle." *Id.* at ¶ 24.

{¶ 103} The testimony provided from Lewis established that appellant and Canty were initially talking in the middle of the street. Thereafter, appellant began walking to his truck and Canty followed. Appellant got into the driver's side of the Tahoe and rolled down the window. Canty was standing "right up next to his truck" and the two men continued to talk. (Tr. 76.) According to Lewis, Canty turned around to walk away. Canty then turned to face the Tahoe and that is when appellant began shooting Canty

from inside the driver's side of the Tahoe.  Appellant then sped away from the scene. Additionally, Sims testified that after he heard several gunshots, he looked out the window and saw the driver of a truck roll up the window and "skirt[ ] out" of the area. (Tr. 450.)

{¶ 104}  When viewed in a light most favorable to the prosecution, as is required under our standard of review for reviewing the sufficiency of the evidence supporting a criminal conviction, the evidence presented at trial was sufficient to support appellant's conviction for the specification pertaining to discharging a firearm from a motor vehicle as proscribed in R.C. 2941.146.  Consequently, we reject appellant's assertion that the record contains insufficient evidence to support the same and overrule his sixth assignment of error.

### G.  Seventh Assignment of Error

{¶ 105}  In his seventh assignment of error, appellant argues he received ineffective assistance of trial counsel.  Under this assigned error, appellant contends his counsel was ineffective for failing to object to prosecutorial misconduct, failing to object to the introduction of evidence pertaining to cash and jewelry, failing to object to hearsay, failing to request a limitation of victim photographs, and eliciting damaging testimony on cross examination.

{¶ 106}  To establish a claim of ineffective assistance of counsel, an appellant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him.  *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The failure to make either showing defeats a claim of ineffective assistance of counsel.  *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ").

{¶ 107}  In order to show counsel's performance was deficient, an appellant must prove that counsel's performance fell below an objective standard of reasonable representation.  *Jackson* at ¶ 133.  The appellant must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional

assistance. *Strickland* at 689. To show prejudice, the appellant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 204.

{¶ 108} Appellant first asserts his trial counsel was ineffective for failing to object to prosecutorial misconduct as outlined in his first assignment of error. Failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel *per se*, as that failure may be justified as a tactical decision." (Emphasis sic.) *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). Furthermore, we have already overruled appellant's first assignment of error and concluded appellant has not established prosecutorial misconduct in this case. " '[C]ounsel will not be deemed ineffective for failing to make a meritless objection.' " *State v. Pariscoff*, 10th Dist. No. 09AP-848, 2010-Ohio-2070, ¶ 37, quoting *State v. Copley*, 10th Dist. No. 04AP-1128, 2006-Ohio-2737, ¶ 48, citing *State v. Shahan*, 4th Dist. No. 02CA63, 2003-Ohio-6945, ¶ 38. As such, because it appears that any objections on the grounds of prosecutorial misconduct based on the allegations contained in appellant's first assignment of error would not have been successful, trial counsel was not ineffective for failing to raise those objections.

{¶ 109} Next, under this assigned error, appellant contends his trial counsel was ineffective for failing to object to the admission of evidence pertaining to the jewelry and $9,000 in cash found at 483 South Ogden. According to appellant, this evidence allowed the prosecutor to argue appellant "was a drug dealer with a motive to kill" Canty. (Appellant's brief, 53-54.) This alone, however, is not sufficient to establish a basis for such evidence to be excluded from trial, and we reiterate that counsel will not be deemed ineffective for failing to make a meritless objection. *Pariscoff.* Moreover, appellant does not argue, much less establish, prejudice under *Strickland.* Given the evidence outlined previously throughout this decision, we conclude appellant has not demonstrated that, had his counsel objected to the admission of the money and jewelry and had such objection been sustained, there is a reasonable probability that the result of the proceeding would have been different.

{¶ 110}  Appellant also challenges his trial counsel's failure to object to hearsay. Here, appellant asserts that, though third-party statements offered to explain a police investigator's conduct are "not technically" hearsay, they should be excluded if the jury is likely to use them to connect the accused to the charged crime.  (Appellant's brief, 54.) It appears appellant is challenging Officer Smith's testimony that a witness at the scene described a suspicious vehicle as an older model Tahoe that was silver in color and Detective Siniff's testimony that a witness at the scene picked two people out of a photo array as being the person involved.  However, other than this blanket and conclusory assertion that such statements should have been excluded, appellant again fails to either argue or demonstrate prejudice.

{¶ 111}  Fourth, under this assigned error, appellant argues his trial counsel's failure to request a limitation of the admission of "gruesome photographs of the victim" constituted ineffective assistance of counsel.  (Appellant's brief, 55.)   According to appellant, though the cause of death was undisputed, a total of 26 photographs including depictions of the crime scene as well as the autopsy were admitted into evidence.

{¶ 112}  Initially, we note that the admission of photographic evidence is left to the sound discretion of the trial court, and a trial court may indeed reject a photograph, otherwise admissible, due to its inflammatory nature if, on balance, the prejudice outweighs the relevant probative value.  *State v. Maurer*, 15 Ohio St.3d 239, 264-65 (1984).  However, "the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible."  (Emphasis sic.)  *Id.* at 265, citing *State v. Woodards*, 6 Ohio St.2d 14, 25 (1966).

{¶ 113}  Further, as the Supreme Court of Ohio stated in *Maurer*, "[t]he fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible."  *Id.* at 265.   Additionally, "relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission."  *Id.*, citing *United States v. Brady*, 595 F.2d 359 (6th Cir.1979).

{¶ 114} Because we cannot say either that an objection to such evidence would have been successful or that there is a probability sufficient to undermine the confidence in the outcome of this case, we are unable to find ineffective assistance counsel.

{¶ 115} Lastly, under this assigned error, appellant contends his trial counsel was ineffective for eliciting damaging testimony on cross-examination of Lewis, at which time Lewis was asked if Morrison told Lewis that Morrison did not want to have anything to do with the case and for Lewis to leave her out of it. Lewis responded, "She said: Please, don't. She has no protection, nobody to save her. She is at home with two little babies by herself. This man has got people out probably looking for me. And I have already got two major threats." (Tr. 144.) Appellant also challenges the line of questioning asking Lewis whether she had ever seen appellant with a gun and whether Lewis had told the police of the same.

{¶ 116} Decisions regarding cross-examination are within the trial counsel's discretion and generally do not form the basis for a claim of ineffective assistance of counsel. *State v. Harris*, 10th Dist. No. 09AP-578, 2010-Ohio-1688, ¶ 28, citing *State v. Flors*, 38 Ohio App.3d 133, 139 (8th Dist.1987). The extent and scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. " '[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.' " *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 40.

{¶ 117} After review, we have no cause to second-guess defense counsel's cross-examination strategy. The challenged cross-examination attempted to cast doubt upon the credibility of the witness. Though such strategy may have failed when unexpected damaging answers were given, an unsuccessful strategy does not render counsel's assistance constitutionally ineffective. *State v. Abdullah*, 10th Dist. No. 05AP-1316, 2006-Ohio-5412, ¶ 35 (although defense counsel's cross-examination strategy may have failed when he encountered unexpected damaging answers, such does not render counsel's assistance constitutionally ineffective).

{¶ 118} For the foregoing reasons, appellant's seventh assignment of error is overruled.

## IV. CONCLUSION

{¶ 119} Having overruled all seven of appellant's assignments of error in their entirety, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and GREY, JJ., concur.

GREY, J., retired, formerly of the Fourth Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____