**[Cite as *State v. Taylor*, 2020-Ohio-3481.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28463 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-4239/1 |
| | : | |
| JERMICHAEL TAYLOR | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of June, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ADAM J. ARNOLD, Atty. Reg. No. 0088791, 120 West Second Street, Suite 1717, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Jermichael Taylor appeals his conviction for the following offenses: Count I: felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; Count II: felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; Count III: burglary (habitation/person present or likely to be present), in violation of R.C. 2911.12(A)(2), a felony of the second degree; and Count IV: having a weapon while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), a felony of the third degree. Counts I, II, and IV were each accompanied by a mandatory three-year firearm specification and a specification that the offender displayed, brandished, indicated possession of, or used a firearm and had a prior conviction. Taylor filed a timely notice of appeal on July 15, 2019.

{¶ 2} The incidents which formed the basis for charges against Taylor occurred on the night of November 26, 2017, when Taylor and his friend, Jamariyo Drane, met with Marqisa Goode and her friend, Davon Williams.[1] Goode testified that she was not familiar with Drane, but she knew Taylor from high school. After meeting at around 10:00 p.m., Goode transported the men in her own vehicle, a silver Chevrolet Monte Carlo, to a bar called Club Plush, where they all drank alcohol. Goode testified that after they had been at the club for a while, a fight broke out, and they decided to leave. Goode, who was intoxicated at this point, testified that she handed her car keys to Davon and told him to meet her at her vehicle.

{¶ 3} Goode testified that, when she reached her vehicle, she observed that Drane

---

[1] More than one participant in the events at issue had the last name Williams, so we will refer to them by their first names.

had taken the car keys from Davon and was sitting in the driver's seat. Davon, who was also intoxicated, was seated in the backseat, and Taylor was seated in the front passenger seat. Goode and Drane briefly argued over the car keys before Drane exited the vehicle and "slammed" Goode to the ground. Drane then got back into the vehicle and drove away with Taylor and Davon in tow. Goode testified that she immediately walked up to a nearby Montgomery County Sheriff's Deputy and reported that her car had been stolen. Because Drane could still be seen driving away at this point, the deputy drove off in pursuit of the stolen vehicle.

{¶ 4} The record further establishes that, while these events were taking place at Club Plush, Shavoria Williams was driving to her residence after dropping off an acquaintance at another location. Shavoria testified that, as she was traveling on Siebenthaler Avenue, she came to a stop at a red light. Shavoria testified that she then saw "flashes" and heard what she knew to be gunshots coming from a vehicle located behind her, a silver Monte Carlo containing multiple individuals. Shavoria testified that she ran the red light because she was being shot at and eventually turned left onto Arlene Avenue in order to escape the shooters. At this point, Shavoria stopped her vehicle and turned on her interior light in an effort to show the individuals shooting at her that she was not who they thought. Shavoria testified, however, that after the shooters passed her in the Monte Carlo, they performed a U-turn and drove back toward her. When she saw the shooters coming back, Shavoria quickly turned down another side street; she then stopped, exited her vehicle, and continued on foot. While she was walking, Shavoria called 911 to report the car chase and shooting. Shortly thereafter, police and emergency personnel arrived at the scene, and she was transported to Miami Valley

Hospital.   After an examination, it was found that Shavoria had been shot in the leg.

{¶ 5} Shortly thereafter, Drane crashed Goode's vehicle into a garage on Arlene Avenue.   Davon, who had been sitting in the back seat, exited the vehicle through the driver's side window only to be tackled by the owner of the residence, Darrell Daniel. Daniel testified that he observed another individual climb out of the passenger side of the vehicle, jump over the hood of the vehicle, and flee the scene.   Daniel held Davon down on the ground until the police arrived and took him into custody.   Taylor and Drane were both able to flee the scene, but both men had suffered significant injuries in the crash. During a later search of the vehicle by police, a .380 semi-automatic handgun was found with an empty magazine.   Notably, Goode testified that Drane later offered to pay for the damage done to her vehicle in exchange for her not testifying against him.

{¶ 6} In an attempt to clean themselves up after the car accident and evade the police, Taylor and Drane broke into the residence of 70-year-old Leslie Cox.   Taylor and Drane used Cox's towels to clean their injuries.   Evidence also indicated that Taylor vomited while inside Cox's residence, and one of Taylor's boots was found under Cox's bed.   Eventually, the two men forced Cox to call Drane's mother and Taylor's girlfriend on her cellphone.   Cox then called her granddaughter, who came to Cox's residence, Cox testified that her granddaughter called the police, at which point Taylor and Drane left Cox's residence.

{¶ 7} Taylor's girlfriend, Angela Lovett, picked him up near Cox's house and took him to his mother's house.   In light of the severity of his injuries, an ambulance was called, and Taylor was transported to the hospital.   After his release from the hospital, Taylor was advised to remain at a rehabilitation center, but he left against his doctor's

orders and disappeared for approximately eight months; he was eventually taken into custody on June 25, 2018. After being informed of his rights and interviewed by Dayton Police Detective Joshua Campbell, Taylor claimed that he had been with his girlfriend the entire time and had not been involved in the shooting.

{¶ 8} On November 20, 2018, Taylor was indicted for the following offenses: Count I: felonious assault (deadly weapon); Count II: felonious assault (serious physical harm); Count III: burglary; and Count IV: having a weapon while under disability. As previously stated, Counts I, II, and IV were each accompanied by a mandatory three-year firearm specifications and by a second specification that the offender displayed, brandished, indicated possession of, or used a firearm and had a prior conviction with a firearm specification. Drane was a co-defendant in the case (Montgomery C.P. No. 2018 CR 4239/2.).

{¶ 9} Because Taylor had been imprisoned for a violation of post-release control stemming from a prior conviction, he was transported from Lebanon Correctional Institution to the Montgomery County Common Pleas Court for his arraignment on February 5, 2019.[2] At his arraignment, Taylor stood mute, and the trial court entered a plea of not guilty on his behalf. On February 19, 2019, Taylor requested a continuance for medical reasons, and the trial court continued the case until March 6, 2019. At a hearing on March 6, 2019, the trial court scheduled a trial date for June 3, 2019. Based upon a discussion held with counsel during the hearing, the trial court issued an "Order Setting Trial Date Beyond Statutory Period."[3]

---

[2] Taylor had been appointed counsel by the trial court on January 22, 2019.

[3] The trial court issued the order on March 29, 2019.

{¶ 10} On March 20, 2019, Taylor was inadvertently brought before the trial court since his original pretrial hearing had been scheduled for that day. Taylor appeared before the court without counsel; the trial court simply informed him again that a final pretrial hearing had been scheduled for May 2019, and the jury trial was scheduled to begin on June 3, 2019.

{¶ 11} On May 30, 2019, a hearing was held before the trial court to address certain pretrial motions and evidentiary issues. Specifically, the trial court addressed two motions filed by Taylor's co-defendant, Drane: a motion to sever and a motion to exclude DNA evidence. At the hearing, Taylor orally moved to join in both of the motions filed by Drane. The trial court granted the motion to sever Drane's and Taylor's cases. With respect to the DNA evidence, the trial court held that the DNA evidence would not be admissible at trial against Taylor because the State had failed to disclose the reports to defense counsel in a timely manner.

{¶ 12} On May 31, 2019, only three days before the trial was scheduled to begin, defense counsel made an oral motion to have Taylor evaluated for competency. We note that the driving force for Taylor's request for a competency evaluation was that he purportedly did not understand his counsel's explanation with respect to his speedy trial rights. After conducting a hearing and questioning Taylor, the trial court overruled the motion for a competency evaluation. The trial court also stated that it believed Taylor's right to a speedy trial had not been violated. Notably, Taylor never filed a formal motion to dismiss based on a speedy trial violation. On June 2, 2019, Taylor filed a memorandum in support of his oral motion for a competency evaluation, which was also overruled by the trial court.

**{¶ 13}** Before the jury was selected, Taylor waived his right to a jury trial with respect to the having a weapon while under disability charge (Count IV) and its specifications, as well as the second specification to Counts I and II.[4]   The jury trial regarding the remaining counts took place from June 3-6, 2019.   The jury found Taylor guilty on all counts.   In an entry filed on June 13, 2019, the trial court also found Taylor guilty of Count IV, having a weapon while under disability, and the specifications.

**{¶ 14}** At sentencing on June 19, 2019, the trial court merged the two felonious assault convictions, and the State elected to proceed with sentencing on Count II, felonious assault (serious physical harm).   The trial court also merged the firearm specifications attached to Count II, with the State electing to proceed with sentencing on the second specification.   The trial court also merged the firearm specifications attached to Count IV, having a weapon while under disability, with the State electing to proceed with sentencing on the second specification.    Thereafter, Taylor was sentenced as follows: eight years for felonious assault, eight years for burglary, and three years for having a weapon while under disability.   Additionally, Taylor was sentenced to 54 months in prison for the firearm specification to Count II and an additional 54 months for the firearm specification to Count IV.   The trial court ordered all of the sentences to be served consecutively, for an aggregate sentence of 28 years in prison.   Taylor was awarded 122 days of jail time credit.

**{¶ 15}** It is from this judgment that Taylor now appeals.

THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION

---

[4] As previously stated, the second specification to Counts I, II, and IV stated that the offender displayed, brandished, indicated possession of, or used a firearm and had a prior conviction.

TO DISMISS A JUROR DUE TO HIS POSSIBLE PRIOR KNOWLEDGE OF THE CASE AT HAND.

{¶ 16} In his first assignment, Taylor contends that the trial court erred when it refused to remove Juror #10 from the jury, based on the fact that he "possibly had information that came from outside the trial."

{¶ 17} "Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials." *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794, ¶ 45. R.C. 2945.29 permits a court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" Crim.R. 24(G)(1) similarly provides that alternate jurors "shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, "[a]s of 2008, Crim.R. 24(G)(1) allows the court to replace a juror after deliberations have begun." *State v. Hunt*, 10th Dist. Franklin No. 12AP-103, 2013-Ohio-5326, ¶ 71. "However, '[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.' " *Id.*, quoting Crim.R. 24(G)(1).

{¶ 18} "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.' " *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198, 500 N.E.2d 323 (11th Dist.1985). (Other citations omitted.) "Absent a record showing that the court abused that discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed." *Id.*, citing *Beach v. Sweeney*, 167 Ohio

St. 477, 150 N.E.2d 42 (1958). (Other citation omitted.)

{¶ 19} "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 20} In the instant case, during jury selection, Juror #10 stated that he worked as an information technologies specialist and sometimes retrieved video footage of criminal acts and provided the footage to the Dayton Police Department. When Juror #10 was questioned by the State, the following exchange occurred:

Juror #10: * * * Yes. Yes, I assist sometimes retrieving video from crimes.

The State: Okay.

A: And we may discuss the, you know. I'm too busy doing IT work to really follow all of the cases that the department has, but you know, I work with Detective Statzer and assist him.

Q: Okay.

A: You know, when he needs IT help. But.....

Q: Okay. Based on the fact you are assisting with certain investigations, let me ask you this. Did you assist in any investigation that you can recall that stems from the date of November 26th of 2017?

A: *No.*

Tr. 76-77.   When voir dire was concluded, Juror #10 was chosen to serve on the jury.

**{¶ 21}** After three of the State's witnesses had testified, Juror #10 informed the bailiff that he believed that he had assisted with retrieving a video taken on the night of the shooting.   Thereafter, the following exchange with Juror #10 occurred outside the presence of the rest of the jury:

> The Court: All right.   And our deputy's here, and counselor here [sic], and Mr. Taylor's here, and our State's rep is here, and my staff is here. * * *   And my understanding, * * * Juror #10, is that you had occasion during the break to indicate to the bailiff something along the lines that you are wondering, I gather, whether or not it might've been you that – I'll use the phrase – pulled the 911 call, or calls that we've heard in this case.

> Juror #10: No, sir.   The video – there may be video of the shooting at the intersection of the car that drove by.   I assisted Dayton Police Department.   I don't know.   The car looks familiar, but I pull so much video. But seeing a picture of the car, it might be that.

> The Court: Let me ask – let me ask State's counsel.   Do we have any video at the intersection or elsewhere that might have memorialized the shooting, or shootings at issue here?

> The State: *We do not.*

> The Court: Okay.

> The State: That was part of the sheriff's investigation.   Dayton was the crash and the burglary.   And that was part of the sheriff's investigation.

And Detective Statzer says, * * * no, he's unaware of anything. He doesn't have anything. I know we don't have anything. There's been no video. It may be a different incident that has occurred that may sound similar, but not in this case, Your Honor.

The Court: All right? So that makes that easy, in that sense. Now, let me ask you the next question. I would assume – but you know, when I assume things, I get in trouble –

Juror #10: Yes, sir.

The Court: -- like assuming I have my wife's permission to do something. That generally gets me in trouble because to hear her tell it, I never have permission to do anything. But here, I assume that – first of all, you're to be commended for bringing your concern to the bailiff. That's exactly what I want you to do. So thank you very much.

Juror #10: Okay.

The Court: I know the lawyers feel that way, and certainly Mr. Taylor does as well. We don't need to do that – suffer in silence. And we need to do just what you did, okay? *Secondly, I assume that now having been given this assurance by State's counsel and the detective that no, there is no video that was pulled by you or anybody else that they would have been able to harvest.*

*And I'm pretty sure they were looking, because that's part of what they do. But there is no such video here. So, does that assuage any concerns that you have about whether or not you can continue to serve on*

*this jury?*

Juror #10: *Yeah, it's that – I just wanted to make sure that there was no conflict.*

The Court: Well, I don't perceive one.   Do the lawyers think, in any way, this is a conflict for [Juror #10]?   I don't see it as one personally.

The State: I don't at this point.   If we had a video, I could understand, but we don't have a video of such.   So no, the only thing we have to present in the form of any audio or video are these 911 calls.   So –

Juror #10: Okay.

The Court: Right, and no, you had no – you had no involvement in harvesting those 911 calls.

Juror #10: That's a –

The Court: Is that fair?

A: Yes, sir.   That's a –

Q: Okay.

A: -- different department that takes those, not here.

Q: Sure.   So would – do you agree with me that, now that we've resolved this, we've answered your questions, that you feel perfectly comfortable continuing to serve on this jury?

A: Yes, sir.

Q: Do you continue to believe, as you've believed all along that you don't favor one side or the other?   You don't favor the State of Ohio, nor do you favor Mr. Taylor at this point?

A: Yes.

Q: Is that fair to say?

A: Yes, sir.

Q: Can you think of any reason at all that you shouldn't continue on this jury?

A: No, sir.

(Emphasis added.) Tr. 223-226.

{¶ 22} After Juror #10 returned to the jury room, the following exchange occurred between defense counsel and the trial court:

Defense Counsel: * *   * All right, Your Honor, my client wishes to have [Juror #10] excused from the jury.

Trial Court: Why?

A: He's concerned that he may have seen some video that is similar to this situation and that may taint his perceptions, taint his judgment about what happened, or did not happen in this case.

Q: Well, I understand your concern, Mr. Taylor.   I don't think it's well-founded at all.   The detective has flat-out – the detective – the witness has flat-out said, based now on the fact that the State says there's no such video of this incident, they looked for the – whether they were, if they found it, they damn sure were going to use it.   But they didn't find it, doesn't exist.

This man, having been given that assurance, indicated it was not he that had anything to do with pulling or harvesting the 911 calls, and that there further, upon inquiry from the Court, he has given the Court no

concern at all that he is in any way biased against anybody in this case, including you.

And the one thing I know about him, he might be the one honest man in this whole trial.   And that is that he came forward with a concern that he had, and as far as I'm concerned, we put it to rest.   So I note your objection; it's overruled. * * *

Tr. 227-228.

**{¶ 23}** As previously stated, after three of the State's witnesses testified, Juror #10 informed the bailiff that there may have been a conflict because he might have pulled surveillance video of the shooting in the instant case.   However, both the prosecutor and the lead detective informed the trial court that no video of the shooting existed Taylor's case.   Therefore, Juror #10 could not have pulled any video surveillance related to the instant case.   Furthermore, upon inquiry by the trial court, Juror #10 agreed that he was perfectly capable of continuing to serve on the jury and held no bias against either party.

**{¶ 24}** Taylor argues that Juror #10 "may have seen some video that is similar to this situation and that may taint his perceptions, taint his judgment about what happened, or did not happen in this case."   Taylor's counsel, however, did not ask Juror #10 a single question when invited to do so by the trial court.   Hence, this argument is wholly speculative.   By all accounts, Juror #10's responses to the trial court's inquiries established that he was not biased against either party and was able to impartially weigh Taylor's guilt or innocence based upon the evidence submitted at trial.   To argue that Juror #10's perceptions were somehow tainted by viewing video surveillance in a separate but similar case simply finds no support in the record.

**{¶ 25}** In support of his argument, Taylor cites *City of Cleveland Heights v. Corlew*, 8th Dist. Cuyahoga No. 64845, 1994 WL 144532 (April 21, 1994). *Corlew*, however, involved a claim of juror misconduct because several of the jurors traveled to the scene of a car accident in a vehicular homicide case. *Corlew* held that the voir dire of the jurors established that they had not gained any new information about the case by the viewing the scene of the accident; thus, there was no juror misconduct. Unlike the decision in *Corlew*, the instant case does not involve a suggestion of juror misconduct. The trial court questioned Juror #10 and reasonably concluded that he did not view any video surveillance involved with Taylor's case because there was none to view. *Corlew* is further distinguishable from the instant case because Juror #10 did nothing to investigate, such as traveling to scene of the shooting.

**{¶ 26}** Significantly, Juror #10 informed the State during voir dire that as part of his job duties, he routinely pulled surveillance videos for Dayton Police detectives. If Taylor had been concerned about Juror #10's potential for bias based on similar cases, he could have so inquired or used a peremptory challenge to remove Juror #10, but he did not. Here, there was no misconduct on the part of Juror #10, and the record establishes that Juror #10 did not view any surveillance footage which could have possibly compromised his ability to fairly and impartially weigh the merits of this case. Rather, the record indicates that Juror #10 was qualified to continue service on the jury and held no bias against either party. Thus, the trial court did not abuse its discretion when it overruled Taylor's objection and allowed Juror #10 to remain on the jury for the duration of the trial.

**{¶ 27}** Taylor's first assignment of error is overruled.

**{¶ 28}** Taylor's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT VIOLATED THE APPELLANT'S RIGHT TO A SPEEDY TRIAL.

{¶ 29} In his second assignment, Taylor argues that the trial court erred when it violated his right to a speedy trial.

{¶ 30} As this Court has noted:

The right to a speedy trial is guaranteed by the United States and Ohio Constitutions. *State v. Adams* (1989), 43 Ohio St.3d 67, 68, 538 N.E.2d 1025. The speedy trial provisions of the Ohio statutes must be strictly construed against the State. *Brecksville v. Cook* (1996), 75 Ohio St.3d 53, 55, 661 N.E.2d 706. A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged. *State v. Price* (1997), 122 Ohio App.3d 65, 68, 701 N.E.2d 41. If the defendant can make this showing, the burden shifts to the State to establish that some exception[s] applied to toll the time and to make the trial timely. *Id.* If the State does not meet its burden, the defendant must be discharged. R.C. § 2945.73. *See, also, State v. Coatoam* (1975), 45 Ohio App.2d 183, 185-186, 341 N.E.2d 635.

*State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-5449, ¶ 15.

{¶ 31} Initially, we note that Taylor never filed a motion to dismiss based upon an alleged speedy trial violation. The only time that an alleged speedy trial violation was discussed was three days before Taylor's trial was scheduled to begin. At his competency hearing on May 31, 2019, in response to inquiries from the trial court

regarding his understanding of the court's pronouncements, Taylor stated that he believed that the trial court had violated his right to speedy trial. However, Taylor never filed a motion to dismiss on this basis, nor did the trial court make a formal ruling with respect to his speedy trial rights. Since the hearing related to Taylor's request for a competency evaluation, the issues raised at that time were confined to Taylor's overall competency and understanding of his rights.

{¶ 32} An appellant's "failure to file a motion to dismiss on speedy trial grounds prior to trial and pursuant to R.C. 2945.73(B) prevents him from raising the issue on appeal." *State v. Humphrey*, 2d Dist. Clark No. 02-CA-25, 2003-Ohio-2825, ¶ 17, citing *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 37.

{¶ 33} In any event, the record establishes that Taylor was brought to trial within the required time period. R.C. 2945.71 provides that "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2). This 270-day period may be extended for one or more of the reasons listed in R.C. 2945.72(A)-(I). Absent any such extension, failure to bring a defendant to trial within the 270-day period subjects the case to dismissal upon motion of the defendant. R.C. 2945.73(B). "When an accused is discharged pursuant to [R.C. 2945.73(B)] * * *, such discharge is a bar to any further criminal proceedings against [the defendant] based on the same conduct." R.C. 2945.73(D). The "triple-count" provision set forth in R.C. 2945.71(E) reduces to 90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial. *See also State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E .2d 902, ¶ 31 (2d Dist.).

{¶ 34} However, the rule is that triple counting applies "only when the defendant is

being held in jail solely on the pending charge." *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, 286, ¶ 7; *see also State v. MacDonald,* 48 Ohio St.2d 66, 357 N.E.2d 40 (1976), paragraph one of the syllabus (construing former R.C. 2945.71(D), now (E))*.* Therefore, the triple-count provision does not apply when a defendant is being held in custody on other charges. *Id.* Nor does it apply when the accused is being held on a parole- or probation-violation holder. *State v. Brown*, 64 Ohio St.3d 476, 479, 597 N.E.2d 97 (1992) (parole-violation holder); *State v. Martin*, 56 Ohio St.2d 207, 211, 383 N.E.2d 585 (1978) (probation-violation holder). Additionally, the triple-count provision does not apply when the accused is simultaneously serving a prison sentence for a separate offense. *State v. Steele*, 8th Dist. Cuyahoga App. Nos. 101139, 101140, 2014-Ohio-5431, ¶ 19.

{¶ 35} Speedy trial time may be waived by the defendant or tolled by operation of law, namely R.C. 2945.72. *State v. Blackburn*, 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, ¶ 11. The tolling of speedy trial time under R.C. 2945.72 is automatic and extends the speedy trial time "whether or not a waiver has been executed." *Id*. at ¶ 18. For instance, time may be tolled for "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." R.C. 2945.72(H). Unlike a waiver, which serves the defendant's interests in obtaining additional time, "the automatic tolling of time * * * operates to protect the state's ability to adequately prosecute persons who have committed crimes." *Id*. at ¶ 21.

{¶ 36} The record establishes that, at the time Taylor committed the instant offenses, he was on post-release control (PCR) supervision in a separate case. Taylor

was not arrested by police initially because of the severe nature of the injuries he suffered in the car accident after the shooting on November 26, 2017. As previously stated, Taylor left treatment early against medical advice and was not located until approximately eight months later. When he was located, however, the record indicates that Taylor was taken into custody on the parole warrant in the separate case, not the arrest warrant issued in this case. Thereafter, Taylor attended a parole violation hearing, his PCR was revoked, and he was sent to prison.

{¶ 37} During the time he was serving a prison sentence for the PCR violation, Taylor was indicted in this case and transferred to the Montgomery County Jail. We note that the warrant for removal from prison stated, "[t]his is a continuing order and shall have continuing effect until the termination of all proceedings in this case." Accordingly, because Taylor was serving a prison sentence stemming from a separate case at the same time he was being held in custody in the instant case, he was not entitled to the triple-count provision. Absent any tolling events, the State therefore had 270 days to bring Taylor to trial. The record establishes that only 119 days passed between the day Taylor was booked into the Montgomery County Jail (February 4, 2019) and when his trial began (June 3, 2019), and thus there was no speedy trial violation.

{¶ 38} Moreover, on February 19, 2019, Taylor filed a motion to continue a hearing originally scheduled for February 20, 2019, for "medical reasons." In an entry filed on February 20, 2019, the trial court granted the continuance and rescheduled the hearing for March 6, 2019. Permissible reasons for extending the trial date include "[a]ny period of delay necessitated by reason of a * * * motion * * * made or instituted by the accused" and *"[t]he period of any continuance granted on the accused's own motion*, and the period

of any reasonable continuance granted other than upon the accused's own motion[.]" R.C. 2945.72(E) and (H). Thus, Taylor's motion for continuance tolled speedy trial time from February 19, 2019, until March 6, 2019. Where an accused requests a continuance of a pretrial hearing, the request tolls the statutory speedy trial period from the date of the request until the date of the rescheduled hearing. *See State v. Wilson*, 2d Dist. Clark No. 2018-CA-2, 2020-Ohio-2962, ¶ 32-33.

**{¶ 39}** Furthermore, prior to trial, Taylor orally moved to join in two motions filed by his co-defendant, a motion to sever filed on May 21, 2019, and a motion to exclude evidence filed on May 28, 2019. As previously stated, on May 30, 2019, the trial court held a hearing on these motions and granted both motions as they related to Taylor. R.C. 2945.72(H) permits the speedy-trial clock to be tolled for the "period of any continuance granted on the accused's own motion, *and the period of any reasonable continuance granted other than upon the accused's own motion*." While the co-defendant's motions did not automatically toll Taylor's speedy trial time, the fact that he joined his co-defendant with respect to both motions tolled Taylor's speedy trial time from May 21, 2019, until May 30, 2019. *See State v. Smith*, 2d Dist. Clark No. 2003-CA-93, 2004-Ohio-6062, ¶ 20 (a motion by a co-defendant may operate to extend speedy trial time for another); *but see State v. Ramey*, 2d Dist. Clark No. 2010-CA-19, 2012-Ohio-6187 (the record did not support a finding that co-defendant's motion to suppress acted to toll defendant's speedy trial time because the motion did not relate to or affect defendant in any way).

**{¶ 40}** Additionally, the time within which an accused must be brought to trial may be tolled by any period during which the accused's mental competence to stand trial is

being determined. R.C. 2945.72(B). On May 31, 2019, Taylor made an oral motion for a competency evaluation, only three day before the trial was scheduled to begin. The trial court held a hearing during which it found Taylor competent to stand trial. On June 2, 2019, Taylor filed a written motion for a competency evaluation, and the trial court filed a written decision overruling Taylor's motion for a competency evaluation on June 3. Accordingly, Taylor's speedy trial time was also tolled from May 31 until June 3, 2019.

{¶ 41} Lastly, during the hearing on March 6, 2019, the trial court set forth its explanation on the record for scheduling the trial date for June 3, 2019. As is apparent from the record, the trial court and the parties erroneously believed that the speedy trial deadline was May 10, 2019. Perhaps, this was the source of Taylor's own confusion. During the hearing the trial court stated the following:

> Trial Court: The Court began by throwing out some trial dates to the parties. We threw out, I think, a date of April the 22nd. I think that date – I don't mean to speak for Mr. Lennen [Counsel for Co-Defendant] – I think Mr. Gramza [Counsel for Taylor] indicated that date would be acceptable to him.
>
> I think State's counsel indicated that would not be acceptable to them, given their schedules and given conflicts – trials already scheduled in other courts in this courthouse.
>
> I threw out the date – I didn't, the bailiff did – of April the 29th. That was acceptable to State's counsel. Mr. Gramza indicated that date was – would not work for him, that he had a previously scheduled matter in another court.

We then talked about May the 13th. That date was unacceptable to State's counsel, owing to a conflict in another court.

We then threw out a date of May the 20th. Mr. Gramza indicated again that date would not work for him, owing to his conflicts on a previously scheduled matter in another court.

And that's what happens when you've got multiple lawyers – good lawyers that represent any number of people and invariably, conflicts arise.

*We finally reached a date that works for everybody, and that was June the 3rd. That, on its face, lies outside the May 10th speedy trial calculation, as I understand it for Mr. Taylor; but nevertheless, certainly is within a reasonable earshot, shall we say of that date. It's also the only date that works for all the lawyers, including Mr. Gramza, Mr. Taylor's counsel; and that is the date, then, that the Court selects.*

The Court believes, and I think the statute bears this out regarding speedy trial, that when the Court gets into trouble, it's when the speedy trial comes and goes and then a date is selected outside the speedy trial date. And I think when that happens, we all understand the implications of that. Here, we had dates that would have worked inside speedy trial, but not for all the lawyers. *The Court has discretion to set this matter at a time that works for all the lawyers and takes into consideration Mr. Taylor's speedy trial rights.*

I have selected, then, the date of June the 3rd for the reasons that I've indicated. I believe that comports with the Court's obligations under

the laws of the State of Ohio and the Revised Code.

Tr., March 6, 2019 Hearing, p. 4-5.

{¶ 42} In *State v. Ramey*, 2012-Ohio-6187, 986 N.E.2d 462 (2d Dist.), we noted that to satisfy the reasonableness standard, " 'when *sua sponte* granting a continuance under R.C. 2945.72(H), the trial court must enter the order of continuance and the reasons therefor by journal entry prior to the expiration of the time limits prescribed in R.C. 2945.71 for bringing a defendant to trial.' " (Italics sic.) *Id.* at ¶ 12, quoting *State v. Mincy*, 2 Ohio St.3d 6, 9, 441 N.E.2d 571 (1982). Consistent with this standard, the trial court stated its reasons during the hearing and also entered its reasons in an entry filed on March 29, 2019. "The reasonableness of a continuance is determined by examining the purpose and length of the continuance." (Citation omitted.) *State v. Gavin*, 2d Dist. Montgomery Nos. 24284, 24285, 2011-Ohio-4665, ¶ 34. Significantly, the record establishes that both Taylor and his counsel were present at the hearing on March 6, 2019.

{¶ 43} "When defense counsel merely acquiesces to a trial date set by the court but does not affirmatively lodge a motion for a continuance, the continuance is entered 'other than upon the accused's own motion' and, under the second clause of R.C. 2945.72(H), must be reasonable." *Ramey* at ¶ 16, citing *State v. Davis*, 46 Ohio St.2d 444, 449, 349 N.E.2d 315 (1976). Here, Taylor's defense counsel did not "merely acquiesce" to the trial date of June 3, 2019, but rather assisted in selecting it based upon conflicts in his work schedule. We also find the explanation provided by the trial court regarding its decision to ostensibly schedule the trial outside of the speedy trial limit to be reasonable and supported by the record. Therefore, the record establishes that the trial court complied with R.C. 2945.72(H) when it decided to toll Taylor's speedy trial time until

June 3, 2019.

{¶ 44} Taylor's second assignment of error is overruled.

{¶ 45} Taylor's third and final assignment of error is as follows:

THE TRIAL COURT ERRED IN NOT PROVIDING THE DEFENDANT A

FORMAL COMPETENCY HEARING AND DEEMING HIM COMPETENT

TO STAND TRIAL.

{¶ 46} In his final assignment, Taylor contends that the trial court erred when it found him to competent to stand trial without first providing him a formal competency hearing. In the alternative, Taylor argues that if we find that the trial court did conduct a proper hearing regarding his motion for a competency evaluation, the trial court still erred in finding Taylor competent as he provided evidence that he did not understand "essential parts of the case or the proceedings, nor could he provide assistance to his attorney." Appellant's Brief, p. 10.

{¶ 47} "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995). If a defendant "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[,]" he may not stand trial. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 155.

{¶ 48} This due process right has been codified at R.C. 2945.37, which provides in pertinent part:

B) In a criminal action in a court of common pleas, * * * [the] defense may

raise the issue of the defendant's competence to stand trial. If the issue is

raised before the trial has commenced, the court shall hold a hearing on the issue as provided in this section. * * *

(C) The court shall conduct the hearing required or authorized under division (B) of this section within thirty days after the issue is raised, unless the defendant has been referred for evaluation in which case the court shall conduct the hearing within ten days after the filing of the report of the evaluation * * *.

{¶ 49} R.C. 2945.371 provides that if the issue of a defendant's competence to stand trial is raised under R.C. 2945.37, the court may order one or more, but not more than three, evaluations of the defendant's present mental condition. Further, R.C. 2945.37(E) states that "[t]he prosecutor and defense counsel may submit evidence on the issue of the defendant's competence to stand trial.

{¶ 50} The use of the word "may" in these statutes indicates that the decision whether to order an examination is a matter within the trial court's discretion. "Taken as a whole, the provisions of R.C. 2945.37 and 2945.371 support the inference that when the initial hearing on a competency motion is held, the trial court is only required to give the defendant, or his counsel, the chance to submit evidence on the issue." *State v. Bailey*, 90 Ohio App.3d 58, 67, 627 N.E.2d 1078 (11th Dist.1992). "If this evidence raises a genuine question as to the defendant's competency, the court can order that one or more evaluations be performed." *Id.*; *State v. Carson*, 2d Dist. Greene No. 2002-CA-73, 2003-Ohio-5958, ¶ 30.

{¶ 51} Thus, we review the decision of the trial court regarding competency determinations/evaluations for an abuse of discretion. *State v. Curry,* 2d Dist. Greene No.

2012-CA-50, 2014-Ohio-3836, ¶ 40. In order to find that the trial court abused its discretion, we must find that the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 52} In determining whether a defendant is competent to stand trial, the test is " ' "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." ' " *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 32, citing *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). It is with this standard in mind that we review the evidence in this record to determine whether Taylor raised a genuine question of his competency to stand trial and whether the trial court abused its discretion by declining to order an evaluation.

{¶ 53} As previously stated, Taylor's counsel orally raised the issue of Taylor's competency to stand trial and requested a competency hearing on May 31, 2019, only three days before trial. Therefore, the trial court held a hearing on May 31, 2019, in order to determine whether Taylor was entitled to a competency evaluation administered by an appropriate expert. During the hearing, defense counsel informed the trial court that Taylor indicated that he did not understand what counsel was saying or telling him when they discussed his case. Defense counsel also stated that he had spoken with Taylor's mother, who claimed that Taylor suffered from some unidentified intellectual deficiency and received Social Security benefits for his disability. Beyond mere conclusory

assertions, however, defense counsel presented no additional evidence to support his claims in this regard.

{¶ 54} The competency hearing was held in open court with all parties present and represented by counsel. Personally addressing Taylor, the trial court reviewed his legal rights with him, in addition to the offenses that he was charged with and the jury trial process. Taylor responded that he understood all of his rights and what was going to happen at trial. At one point during the hearing, Taylor indicated that he believed his speedy trial rights had been violated because his trial had been scheduled beyond 90 days. Notably, Taylor's statements in this regard established that he understood that he had a right to speedy trial, that speedy time in his case was normally 90 days because he was in custody, and that his trial had been scheduled beyond the 90-day time frame. While he may have been incorrect and in disagreement with the trial court regarding the speedy trial issue, that fact, standing alone, did not render him incompetent to stand trial.

{¶ 55} At the time of the hearing, Taylor was 26 years old, had completed school through the 11th grade, and indicated that he could read and understand the English language. The record establishes that Taylor had been previously convicted of aggravated robbery with a firearm specification and of felony escape. Taylor had received prison sentences for both convictions. The trial court noted that it had reviewed Taylor's presentence investigation report and found no evidence supporting a legitimate competency issue.

{¶ 56} During the hearing, defense counsel also stated that Taylor did not understand the stipulation regarding his prior conviction. Defense counsel, however, stated that after he spent approximately one hour explaining the process to him, Taylor

agreed to the stipulation and signed the document. Simply because defense counsel took an hour to explain the prior-conviction stipulation to Taylor did not establish that he was incompetent to stand trial, nor did it require that a psychological evaluation be ordered. The record establishes that even the trial court and the attorneys were in disagreement regarding the use of Taylor's prior convictions at the time of the competency hearing.

{¶ 57} Significantly, although claiming he was incompetent, Taylor was able to speak to the trial court on his own behalf on a variety of issues, including a parole officer's testimony at another proceeding regarding Taylor's prior convictions, the lack of DNA evidence connecting him with the instant offenses, and his speedy trial rights. Although he claimed he was confused, Taylor affirmatively stated that he understood his rights and that he understood the purpose of the competency hearing. The record establishes that at all times Taylor was able to communicate with the trial court clearly and effectively.

{¶ 58} As previously stated, the burden was on Taylor to adduce evidence at the hearing of his late claim of incompetency. "Incompetency is defined in Ohio as the defendant's inability to understand ' * * * the nature and objective of the proceedings against him or of presently assisting in his defense.' R.C. 2945.37(A)." Here, the record established that Taylor understood his rights, understood the nature of the trial proceedings, and could assist in his own defense. There was no evidence adduced at the competency hearing which indicated that he did not understand the nature of the proceedings or that he could not assist defense counsel in his own defense. Rather, the transcript of the competency hearing establishes that Taylor was articulate and knowledgeable of the charges he faced. Taylor had prior convictions, and thus, he had

pre-existing knowledge and exposure to the criminal legal system. It is noteworthy that Taylor attempted to assert his incompetence only three days prior to the beginning of his trial despite multiple prior appearances before the trial court wherein his conduct suggested that he was competent. Accordingly, the trial court did not err when it found Taylor to be competent to stand trial without ordering a psychological evaluation.

{¶ 59} Taylor's third assignment of error is overruled.

{¶ 60} All of Taylor's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Adam J. Arnold
Hon. Steven K. Dankof